# EXHIBIT A

| Summary report:<br>Litera Compare for Word 11.3.1.3 Document comparison done on 2/13/2026 11:27:52 AM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2025-08-11 [028] First Amended Complaint.pdf | |
| **Modified filename:** 2025-12-08 [037] First Amended Complaint.pdf | |
| **Changes:** | |
| Add | 140 |
| Delete | 182 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 330 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### ~~MIDLAND/ODESSA~~ MIDLAND-ODESSA DIVISION

| | |
|---|---|
| HEADWATER RESEARCH LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> GOOGLE LLC, <br><br> *Defendant*. | Case No. 7:25-cv-~~00231~~-367-DC-DTG <br><br> **First Amended Complaint for Patent Infringement** <br><br> **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., in which Plaintiff Headwater Research LLC ("Headwater") alleges as follows against Defendant Google LLC ("Google"):

### GOOGLE REAPS IMMENSE VALUE FROM ITS INFRINGEMENT

1.      This first amended complaint arises from Google's unlawful infringement of U.S. ~~Patent Nos. 9,615,192 ("'192 patent") and 10,321,320 ("'320~~ Patent No. 9,198,117 ("'117 patent") (~~collectively,~~ "Asserted ~~Patents~~Patent").

2.      A core aspect of the accused systems is Firebase Cloud Messaging ("FCM"). As detailed below, Google reaps substantial revenues and competitive advantages from FCM and its infringement of the Asserted ~~Patents~~Patent. As Google's corporate representative, Mr. Todd Hansen testified at the trial in *~~Headwater Research LLC v. Samsung Electronics Co.,~~* Case No. 2:23-CV-00103-JRG-RSP ~~(E.D. Tex.)~~ ("103 Case"): "Q. Now, ***how many devices use FCM*** today? A. ***Billions of devices***." 103 Case, Trial Tr. 732:7-8 (emphasis added).

3.     The immense value Google derives from FCM is underscored by its Revenue-Share

Agreement ("RSA") and Mobile Application Distribution Agreement ("MADA") with Samsung:

*[Link-to-previous setting changed from on in original to off in modified.]*

public testimony in the Department of Justice's 2025 antitrust case revealed that Google paid

Samsung about $8 billion between 2020 and 2023—roughly $2 billion per year—to ensure Samsung devices, including Galaxy phones and tablets, ship with Google Play Services (and, by extension, the embedded FCM client stack) pre-installed and set as the system-level default. Through these agreements, Google guarantees (i) FCM starts generating revenue for Google out-of-the-box on the world's best-selling Android hardware and continues to monetize subsequent push interactions and push-driven engagement, and (ii) Google, not competing push providers, controls the only OS-level push channel on those devices, which Google uses to route push messages, collect user data, and monetize engagement—including from ad impressions, in-app purchases, and by feeding the user data it collects into its ad-targeting algorithms, and charging app developers for high-priority delivery.

4.      On every Android handset and tablet that ships with Google Play Services, Google configures a persistent connection—called the "MCS" (Mobile Connection Server) channel—between the device and Google's FCM server. Because it is a centralized channel through which Google delivers push messages for *all* applications utilizing FCM, the MCS channel enables Google to siphon device- and app-level telemetry, and engage in continuous monitoring of user behavior across the device. For example, Google can identify which applications are installed on the device, monitor which ones are actively used, and track the frequency and timing of their usage. Even where apps do not share data directly with one another, Google can correlate behavioral patterns across apps by analyzing metadata such as wakeup events, push delivery timestamps, and message receipt activity. Thus, unlike traditional tracking mechanisms—such as cookies or app-specific SDKs—FCM enables a deeper and more comprehensive level of behavioral monitoring that users cannot meaningfully detect, restrict, or opt out of.

*[Link-to-previous setting changed from on in original to off in modified.].*

5.          For example, when the FCM SDK first launches (and whenever it rotates) on an Android device, it generates an Instance ID and a corresponding registration token that uniquely map each installed app to the underlying Android device. Google ties those identifiers to the user's Google Account and advertising ID. The same Instance ID is shared with Google Analytics which enables Google to correlate every FCM push notification with downstream user actions (opens, purchases, ad clicks, etc.). Google surfaces these correlations in the Firebase console and pipes the raw event stream into BigQuery for high-value data mining, e.g.:

| | Firebase Dynamic Links analytics | Google Analytics |
|---|---|---|
| Events tracked | • App first-open<br>• App re-open<br>• Clicks<br>• Redirects<br>• App-installs | • App first-open<br>• App re-open<br>• App updates |
| Data access | • Firebase console (Dynamic Links section)<br>• REST API | • Firebase console (Analytics section)<br>• BigQuery export |
| Custom campaign attribution (utm_ parameters) | 🚫 | ✓ |

Both analytics options track in-app events that web-based tracking tools often miss. For example, when a Dynamic Link is opened on iOS as a Universal Link, the link is opened directly by the app, bypassing web analytics; these events are correctly tracked by both Firebase Dynamic Links analytics and Google Analytics.

https://firebase.google.com/docs/dynamic-links/analytics.

6.          Google aggregates this data across apps to build granular profiles of the user's interests, app-usage cadence, time-of-day activity, and location patterns—and uses this data to fuel its ad-targeting algorithms, enabling it to serve "the exact right message to the exact right audience at                    precisely                    the                    right                    time."

https://business.google.com/us/think/future-of-marketing/2032-marketing-predictions/.          Indeed, Google markets FCM as a tool to "drive user re-engagement and retention" which in turn generates ad revenue for Google, including through the conversion of FCM-driven data and engagement into targeted advertising inventory, higher click-through rates,

and optimized ad auction pricing. *See* https://firebase.google.com/docs/cloud-messaging. For example, Google instructs app developers to log ad_impression events so that ad revenue can be measured "in Google Analytics for Firebase," connecting notification campaigns directly to ad monetization metrics that Google uses to tune its real-time-bidding (RTB) auction engine. https://firebase.google.com/docs/analytics/measure-ad-revenue.

7.      And because virtually all modern Android apps rely on FCM for push notifications, Android device manufacturers and carriers must license Google Play Services—and accept Google's data-sharing terms—or risk shipping devices with limited functionality, including the inability to receive push notifications, which would not be acceptable to users.

8.      Google further profits from FCM by selling add-ons such as Gemini in Firebase which "provides messaging campaign summarization, insights, and guidance to improve your Firebase Cloud Messaging and In-App Messaging campaign performance" and "can help you understand your campaigns' reach and impact and suggests strategies to improve user engagement and growth." https://firebase.google.com/docs/in-app-messaging/compose-campaign.

9.      In sum, FCM is Google's principal mechanism for binding the Android ecosystem as a whole—including Android device OEMs, carriers, app developers, and users—to Google's advertising platform. Google converts FCM push messages into a continuous feedback loop of behavioral data that feeds into a unified Google Analytics pipeline, enabling Google alone to appropriate the full commercial value of users' engagement data, while compelling others (e.g., OEMs, carriers, app developers) to adhere to Google's data-sharing terms or risk unacceptably degraded device functionality.

10.     On information and belief, Google's revenues derived from FCM since 2019 extend well into the tens of billions of dollars.

## GOOGLE'S KNOWLEDGE OF THE ASSERTED ~~PATENTS~~PATENT

11.     On information and belief, Google has had knowledge of the '~~192~~117 patent and the

infringement thereof by FCM since at least ~~July~~March 2023 when Headwater served its ~~First Amended~~ Complaint ~~(FAC)~~ in Case No. 2:23-CV-00103-JRG-RSP ("103 Case"). The ~~FAC~~103 Complaint and its '~~192~~117 claim chart exhibit disclosed Headwater's infringement theory against FCM ~~and explicitly mentions Firebase~~. On information and belief, Samsung shared the ~~FAC~~103 Complaint and claim chart with Google in the ~~July~~March 2023 timeframe.

12.     On information and belief, Google has also had knowledge of the '~~192~~117 patent and

the infringement thereof by FCM since at least September 2023 when Headwater served its preliminary infringement contentions in the 103 Case, which provided additional evidence showing how FCM infringes the '~~192~~117 patent. On information and belief, Samsung shared those contentions with Google in the September 2023 timeframe.

13.     At the time of the claim chart and at the time of the preliminary infringement

contentions in the 103 Case, discovery was ongoing, and Headwater did not have all of the discovery in the case necessary to explicitly detail all of Google's backend operations. However, on information and belief, when Google received the claim chart or infringement contentions shared by Samsung, Google knew or should have recognized that Google's FCM was the back-end system accused of infringement because Google was the entity actually providing the accused back-end services depicted in the infringement contention or claim chart. In the alternative, on information and belief, Google turned a blind eye to infringement when its customer or business partner Samsung was accused of infringement for using Google's FCM and shared the infringement contentions with Google, and instead of seeking to license the patent that

Google FCM was infringing, Google quietly continued its infringement while simply hoping that

it would

not be sued. In the alternative, on information and belief, Google is willfully infringing under the

doctrine of "efficient infringement," where Google continues infringement while hoping that the

amount of recovered damages will be less the actual benefit that Google receives from its

ongoing patent infringement.

14.     On information and belief, Google has also had knowledge of the '~~192~~117 patent and

the infringement thereof by FCM since at least September 2024. At that time, Headwater served an

expert report in the 103 Case that described in further detail how FCM infringes the '~~192~~117

patent. On information and belief, that report was shared with Google in the September 2024

timeframe.

15.     On information and belief, Google has also had knowledge of the '117 patent and

the infringement thereof by FCM since at least April 2025 when an Eastern District of Texas jury

returned a $279 million verdict, finding FCM infringes the '117 patent.

~~15~~16.     Indeed, on information and belief, Google was actively engaged as an interested,

non-party participant throughout the 103 case, including fact and expert discovery as well as trial.

On information and belief, and as shown in the public record in the 103 case's jury trial and pretrial

proceedings, Google was an interested party with an indemnitor's interest in the outcome of the

case. Moreover, Google's trial counsel with the Quinn Emanuel firm in this case also served as

outside counsel in the 103 case. Specifically, the same Quinn Emanuel counsel representing Google

in this case were counsel of record for both the Samsung defendants and Google in the 103 case,

and their involvement included (1) conducting the direct examination of Google's corporate

representative at the 103 trial, (2) conducting a cross examination of Headwater's technical expert

at the 103 trial, and (3) responding to Headwater's subpoena to Google and defending the

deposition of Google's corporate representative during the fact discovery period of the 103 case.

16. On information and belief, Google has also had knowledge of the '320 patent since

at least July 2023 when Headwater served its First Amended Complaint (FAC) in the 103 Case,

demonstrating how FCM infringes related U.S. Patent No. 9,198,117 ("'117 patent"), or since at

least September 2023 when Headwater served its preliminary infringement contentions which provided additional evidence of infringement of the '117 patent by FCM, or since at least September 2024 when Headwater served an expert report describing in further detail how FCM infringes the '117 patent.

17. Indeed, the '320 patent shares a common parent with the '117 patent — the '117 patent is a continuation of App. No. 14/263,604, a parent application to the '320 patent.

18. On information and belief, Google has also had knowledge of (at least by being willfully blind to) the '320 patent since April 2025 when an Eastern District of Texas jury returned a $279 million verdict, finding FCM infringes the related '117 patent (which shares a common parent with the '320 patent, as discussed above).

~~19~~17. On information and belief, Google has been coordinating generally with Samsung in patent cases against Headwater because Google provides the Android operating system and

back-end services (like FCM) used by Samsung smartphones that infringe Headwater's patents. At minimum, the ongoing business relationship between Google and Samsung would compel them to work together and exchange information, if not compelled by contractual obligations between them. In the 103 case, Samsung was represented by Quinn Emanuel Urquhard & Sullivan LLP, including its attorneys Brady Huynh, and Lance Yang. These same attorneys are representing Google in this case.

20 18. Patent cases between Headwater and Samsung include:
- *Headwater Research LLC v. Samsung Elec. Co., Ltd.*, No. 2:22-cv-00422 (E.D. Tex.),

  filed in 2022.

- *Headwater Research LLC v. Samsung Elec. Co., Ltd.*, No. 2:22-cv-00467 (E.D. Tex.),

  filed in 2022.

- *Headwater Research LLC v. Samsung Elec. Co., Ltd.*, No. 2:23-cv-00641 (E.D. Tex.),

  filed in 2023.

- *Headwater Research LLC v. Samsung Elec. Co., Ltd.*, No. 2:24-cv-00228 (E.D. Tex.),

  filed in 2024.

- *Headwater Research LLC v. Samsung Elec. Co., Ltd.*, No. 2:24-cv-00627 (E.D. Tex.),

  filed in 2024.

2119.    Based on the quantity of ongoing related Headwater patent cases, based on the sharing of counsel, based on Google's provision of Android and back-end services to Samsung's phones, based on the involvement of Google's corporate witness at trial, based on $279 million verdict, and based on ongoing exposure to the Headwater patent family, it is believed that Google is coordinating patent litigation with Samsung against Headwater, that Google is engaging in ongoing monitoring of the Headwater patent family (including the '320 patent and the '192117 patent) related to multiple

Headwater patents asserted against Samsung, and that Google has analyzed and is aware of Google's infringement exposure to Headwater's patent family (including Google's infringement exposure to the ~~'320 patent and the '192~~'117 patent) as part of litigation due diligence that is warranted for cases of this magnitude.

## BACKGROUND REGARDING HEADWATER AND DR. RALEIGH

~~22~~ 20.    Dr. Gregory Raleigh—the ~~primary~~ inventor of the Asserted ~~Patents~~Patent—is a ~~world~~ world-renowned ~~renowned~~ scientist, inventor, and entrepreneur, with over 25 years of executive experience in several technology sectors including networking, cloud software, consumer services, wireless and military systems. Dr. Raleigh holds Ph.D. and Masters degrees in Electrical Engineering from Stanford University, and is the inventor of over 350 issued U.S. and international patents in several

fields including radio systems and components, radar, mobile operating systems, cloud services, IoT, networking, consumer electronics, radiation beam cancer therapy and medical imaging.

2321.    Dr. Raleigh has a long and distinguished record of significant contributions and advancements in wireless communications technology. His inventions, companies, and products have profoundly and positively impacted virtually every aspect of the mobile device and communications market. In 2005, Dr. Raleigh was named one of the "50 most powerful people in networking" because of his discoveries in wireless technology, and his work in multiplying the capacity of a radio link using multiple transmission and receiving antennas to exploit multipath propagation was described as the "most important wireless technology in the works." *See* https://web.archive.org/web/20220628132409/https://www.networkworld.com/article/2316916/the-50-most-powerful-people-in-networking.html?page=2.

2422.    In 1996, while at Stanford University, Dr. Raleigh presented the first mathematical proof demonstrating that multiple antennas may be used with special signal processing techniques

to transmit multiple data streams at the same time and on the same frequency while in the presence of naturally occurring multipath propagation. Dr. Raleigh's work at Stanford has been widely adopted in modern multiple-input and multiple-output ("MIMO") radio communication and implemented in major wireless communication standards including 4G and 5G. *See, e.g.*, https://en.wikipedia.org/wiki/Gregory_Raleigh.

2523.    Dr. Raleigh's groundbreaking work solved problems that had existed in wireless communication since the late 1800s and overturned a century of research and practice in the fields of radio science and wireless communication theory. His work revealed that a new class of MIMO signal processing architectures would allow wireless devices to transmit multiple data streams at the same time on the same frequency thereby multiplying the capacity of wireless networks.

2624.    Based on his discoveries, Dr. Raleigh co-founded Clarity Wireless to develop smart antenna products incorporating the advances of his MIMO signal processing architecture, and obtained patents now used in 4G and 5G cellular and Wi-Fi standards. Field trials of the smart antennas developed by Clarity Wireless demonstrated performance significantly above anything else contemplated at the time and continue to set standards for multipath broadband wireless access links. Shortly after those field trials, Cisco acquired Clarity in 1998 and hired Dr. Raleigh to continue to commercialize these technologies.

2725.    After leaving Cisco, Dr. Raleigh founded Airgo Networks to develop the world's first MIMO wireless chipsets, networking software, reference design systems and commercial OEM products. Airgo Networks' chipset products significantly improved the speed and reliability of Wi-Fi, leading to the adoption of its technology as the core of Wi-Fi radio standards since 2006, and adoption of the chipsets into products sold across the globe. In 2006, Qualcomm acquired Airgo Networks and hired Dr. Raleigh to continue to commercialize these technologies. The Airgo

team at Qualcomm spearheaded the creation of Wi-Fi standards and developed the first Qualcomm Wi-Fi chips for cell phones.

~~28~~26.  Dr. Raleigh's innovations at Clarity Wireless, Cisco, Airgo Networks, and Qualcomm, resulted in widespread adoption of his technologies in a multitude of cellular and Wi-Fi standards, such as LTE, WiMAX, 802.11n, 802.11ac (Wi-Fi 5), and 802.11ax (Wi-Fi 6).

~~29~~27.  After successfully founding and selling Clarity Wireless and Airgo Networks to Cisco and Qualcomm, respectively, Dr. Raleigh shifted his focus from solving radio-centric problems to solving problems in how wireless services are provided to consumers. Dr. Raleigh foresaw significant data demand problems presented by the advent and adoption of smartphones.

He sought to solve these data demand problems by improving end-user wireless devices and the services that support them.

~~30~~28.   In 2008, Dr. Raleigh formed Headwater to develop mobile operating systems and cloud technology, which today, underpin the mobile phone and app industries. The patents in this action describe and claim some of the extraordinary inventions developed by Dr. Raleigh.

### PLAINTIFF HEADWATER AND THE ASSERTED ~~PATENTS~~PATENT

~~31~~29.   Plaintiff Headwater was formed in 2011 and has been in continued existence and operation since that time. Headwater is a Texas limited liability company organized under the laws of Texas, with its headquarters at 110 North College Avenue, Suite 1116, Tyler, Texas 75702.

~~32~~30.   Headwater is the owner of U.S. Patent No. ~~9,615,192~~9,615,117, titled "Message link server

with plural message delivery triggers," which issued April 4, 2017.

~~33.~~   ~~Headwater is the owner of U.S. Patent No. 10,321,320, titled "Wireless network buffered message system," which issued June 11, 2019.~~

### DEFENDANT GOOGLE AND THE ACCUSED INSTRUMENTALITIES

~~34~~31.   On information and belief, Google LLC is a wholly-owned subsidiary of Alphabet, Inc, and a Delaware limited liability company, with an established place of business at 500 West

2nd Street, Austin Texas 78701 at which Google can be served with process.

35 32.   The Accused Instrumentalities include Google's Firebase Cloud Messaging (FCM) system and any related components or entities identified in Exhibits Exhibit 1 and 2, including but not limited to Google Pixel devices and Google mobile apps which utilize FCM messaging.

## JURISDICTION AND VENUE

36 33.   This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq.

37 34.   This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

38~~35~~.    This Court has personal jurisdiction over Google in this action because Google has committed acts of infringement within this District giving rise to this action, has a regular and established place of business in this District, and has established minimum contacts with this forum such that the exercise of jurisdiction over Google would not offend traditional notions of fair play and substantial justice. Google, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising its products and/or services in Texas and the Western District of Texas, regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in Texas, and commits acts of infringement of Headwater's patents in this District by, among other things, supplying, distributing, developing, making, using, offering to sell, and selling Android, Android devices, and FCM-related services.

36~~39~~.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b). On information and belief, Google resides in this District and/or has committed acts of infringement and has a regular and established place of business in this District.

37~~40~~.    On information and belief, Google operates FCM MCS servers in this District, which act as the always-on FCM ingress and egress points for Android devices in this District. These servers maintain the persistent MCS channel between those Android devices and the FCM server through which push messages are sent to the intended devices.

38~~41~~.    On information and belief, Google employs engineering, product-operations, and marketing teams at its Austin campus—including personnel working with FCM and Android Core Services. From their offices in this District, those employees create, schedule, and transmit push-notification campaigns, e.g., for app developers with whom they collaborate.

42~~39~~.  On information and belief, app developers such as Instagram, WhatsApp, Bumble, Badoo, Vrbo, RetailMeNot, Indeed, Atlassian, Instagram, and WhatsApp use Google's infringing FCM system in this District to send messages to apps on Android devices in this District.

## COUNT 1 – INFRINGEMENT OF THE '~~192~~117 PATENT

43~~40~~.  Headwater incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

44~~41~~.  On April 4, 2017, the United States Patent and Trademark Office issued U.S. Patent No. ~~9,615,192~~9,198,117, titled "~~Message link server with plural~~Network system with common secure wireless message ~~delivery triggers~~service serving multiple applications on multiple wireless devices."

45~~42~~.  Headwater is the owner of the '~~192~~117 patent with full rights to pursue recover of royalties for damages for infringement, including full rights to recover past and future damages.

46~~43~~.  The written description of the '~~192~~117 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time

of the invention.

47~~44~~. Headwater and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '~~192~~117 patent, and Headwater is entitled to damages for Google's past infringement.

48~~45~~. Google has directly infringed (literally and equivalently) and induced others to infringe the '~~192~~117 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '~~192~~117 patent and by inducing others to infringe the claims of the '~~192~~117 patent without a license or permission from Headwater, such as for example inducing any app developers to use the infringing FCM system.

49<u>46</u>.   Exhibit 1 provides a description of the Accused Instrumentalities and a chart showing how they infringe claim 1 of the '~~192~~<u>117</u> patent, which Headwater provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

50<u>47</u>.   Headwater also incorporates by reference the '~~192~~<u>103 trial record pertaining to Google's infringement of the '117 patent as well as the '117</u> patent infringement section of the expert report of Mr. Erik de la Iglesia served in the 103 Case, which Headwater understands has been shared with Google.

51<u>48</u>.   Google knowingly and intentionally induces and contributes to infringement of the '~~192~~<u>117</u> patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Google has had knowledge of or has been willfully blind to the '~~192~~<u>117</u> patent and the infringing nature of the Accused Instrumentalities for at least the reasons discussed above. *See* Google's Knowledge of the Asserted ~~Patents~~<u>Patent</u> above, which is incorporated by reference herein. <u>The Accused Instrumentalities are not a staple article or commodity of commerce suitable for substantial noninfringing uses.</u>

52<u>49</u>.   Despite this knowledge, Google ~~continues~~<u>has continued</u> to actively encourage and instruct———————————————— ~~their~~ ~~customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '192 patent. Google does so knowing and intending that their customers will commit these infringing acts. Google also continues to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite its knowledge of the '192 patent, thereby specifically intending for and inducing their customers to infringe the '192 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.~~
~~53.   Google has known, or has been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '192 patent.~~

54.    Headwater has been damaged by Google's infringement of the '192 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

### COUNT 2 – INFRINGEMENT OF THE '320 PATENT

55.    Headwater incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

56.    On June 11, 2019, the United States Patent and Trademark Office issued U.S. Patent No. 10,321,320, titled "Wireless network buffered message system."

57.    Headwater is the owner of the '320 patent with full rights to pursue recover of royalties for damages for infringement, including full rights to recover past and future damages.

58.    The written description of the '320 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

59.    Headwater and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '320 patent, and Headwater is entitled to damages for Google's past infringement.

60.    Google has directly infringed (literally and equivalently) and induced others to infringe the '320 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '320 patent and by inducing others to infringe the claims of the '320 patent without a license or permission from Headwater, such as for example inducing any app developers to use the infringing FCM system.

61.    Exhibit 2 provides a description of the Accused Instrumentalities and a chart

showing how they infringe claim 1 of the '320 patent, which Headwater provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

62. Google knowingly and intentionally induces and contributes to infringement of the '320 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Google has had knowledge of or has been willfully blind to the '320 patent and the infringing nature of the Accused Instrumentalities for at least the reasons discussed above. *See* Google's Knowledge of the Asserted Patents above, which is incorporated by reference herein.

63. Despite this knowledge, Google continues to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '320117 patent. Google does so knowing and intending that their customers will commit these infringing acts. Google also continues to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite its knowledge of the '320117 patent, thereby specifically intending for and inducing their customers to infringe the '320117 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

6450. Google has known, or has been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '320117 patent.

6551.   Headwater has been damaged by Google's infringement of the '320117 patent                           and                           is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## **JURY DEMAND**

6652.   Headwater demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## RELIEF REQUESTED

Headwater prays for the following relief:

A.      A judgment in favor of Headwater that Google has infringed the Asserted ~~Patents~~Patent, and that the Asserted ~~Patents are~~Patent is valid and enforceable;

B.      A judgment and order requiring Google to pay Headwater past and future damages arising out of Google's infringement of the Asserted ~~Patents~~Patent in an amount no less than a reasonable royalty, costs, expenses, and pre- and post-judgment interest, as provided under 35 U.S.C. § 284;

C.      A judgment and order requiring Google to provide an accounting and to pay supplemental damages to Headwater, including, without limitation, pre-judgment and post-judgment interest;

D.      A judgment that Google's infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

E.      A finding that this case is exceptional under 35 U.S.C. § 285, and an award of Headwater's reasonable attorney's fees and costs; and

F.      Any and all other relief to which Headwater may be entitled.

Dated: ~~August 11~~December 8, 2025                    Respectfully submitted,

                                        */s/ Marc Fenster*
                                        Marc Fenster
                                        CA State Bar No. 181067
                                        Email: mfenster@raklaw.com
                                        Reza Mirzaie
                                        CA State Bar No. 246953
                                        Email: rmirzaie@raklaw.com
                                        Brian Ledahl
                                        CA State Bar No. 186579
                                        Email: bledahl@raklaw.com
                                        Dale Chang
                                        CA State Bar No. 248657

Email: dchang@raklaw.com
Kristopher Davis
CA State Bar No. 329627
Email: kdavis@raklaw.com
James Pickens
CA State Bar No. 307474
Email: jpickens@raklaw.com
James S. Tsuei
CA State Bar No. 285530
Email: jtsuei@raklaw.com
Jason M. Wietholter
CA State Bar No. 337139
Email: jwietholter@raklaw.com
**RUSS AUGUST & KABAT**

12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

Qi (Peter) Tong
TX State Bar No. 24119042
Email: ptong@raklaw.com
**RUSS AUGUST & KABAT**
8080 N. Central Expy., Suite
1503 Dallas, TX 75206
Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF,
Headwater Research LLC**